**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 25-mj-215** |
| **JORDAN HOLLEY,** | |
| **Defendant.** | |

## <u>MOTION FOR REVIEW AND APPEAL OF RELEASE ORDER</u>

The United States of America, by and through its undersigned counsel, respectfully appeals, and seeks this Court's review of, the magistrate court's September 15, 2025, Order denying its motion for pretrial detention.

The defendant, Jordan Holley, poses an unmitigable risk to community safety and should be detained pending trial. Mr. Holley communicated with an undercover officer (UC) for almost two weeks about Mr. Holley's interest in sexually abusing the UC's purported nine-year-old daughter. On September 10, 2025, Mr. Holley traveled from Maryland to Washington, DC to carry out that sexual abuse. Mr. Holley was charged by complaint with Travel with Intent to Engage in Illicit Sexual Activity, in violation of 18 U.S.C. §2423(b).

The government sought pretrial detention of the defendant pursuant to 18 U.S.C. §§ 3142(e)(3)(E) (rebuttable presumption in favor of detention), and 3142(f)(1)(A) (crime of violence) because there is no condition or combination of conditions of release that will reasonably assure the safety of any person or the community. The magistrate court held a detention hearing on September 15, 2025. The court ordered the defendant released to his home in Randallstown, Maryland and named the defendant's mother, Willanetta Holley, as third-party custodian. The magistrate court concluded that the modified third-party custodian plan would adequately mitigate the risk to the community posed by the defendant if he were to be released.

The magistrate court erred by not adequately considering the Section 3142(g) factors as they apply in this case, including the nature and circumstances of the charged child sexual exploitation offense and the nature and seriousness of the danger to any person or the community. Moreover, the proposed third-party custodian would not reasonably ensure the safety of the community. For reasons that follow, this Court should reverse the magistrate court's release order and detain the defendant pending trial.

## **BACKGROUND**

On Thursday, August 28, 2025, an FBI Task Force Officer (TFO) working with the Washington Field Office was acting in an undercover (UC) capacity as part of the Metropolitan Police Department-Federal Bureau of Investigation (MPD-FBI) Child Exploitation Task Force, operating out of a satellite office in Washington, D.C.  In that capacity, the UC entered a fetish website.  Different areas of this site are known to the UC as places where people meet, discuss, and trade original images of underage children, links containing child pornography. On August 28, 2025, a user using the screen name "FeetAddict202" and stating his location to be Owings Mills, MD, later identified as Jordan Holley, initiated a private message chat with the UC within the fetish website.[1]

The following is the chat between Mr. Holley and the UC on the fetish website:

> FeetAddict202: If you ever want to teach her about BBC[2] or cock in general, use me as a stunt cock for her practice.
>
> UC: lol i think we might be liked minded
>
> FeetAddict202: When I saw your post I figured we would be. Too many bulls scared to doit but im not. If you're going to introduce your daughter to the world of BBC and cock, why not have a real one for her to use as practice

---

[1] The UC referenced having a young daughter on a group message within the fetish website.
[2] BBC is commonly used as slang for "big black cock."

FeetAddict202: I am Brutus, and ill be your BBC you have your daughter practice with as you watch. How's that for kinky fun? (wink emoji)

UC: where else do you like to chat I like where this is going

FeetAddict202: "Kik, telegram, my number, even email. Pick any. I'm serious about this. Live action porn in your own home. Me and her. Our secret fun time.

UC: whats your number

FeetAddict202: 443-834-XXXX

On Thursday, August 28, 2025, the UC sent a message to 443-834-XXXX, stating, "It's Rob from [aforementioned fetish website]". The user responded, "Hey Rob. Its Brutus. Glad we met." The following is a portion the text messages sent between the UC and Mr. Holley:

UC: Yes not fantasy right

MR. HOLLEY: Correct. Real life. *I have experience with daughters and fathers*, you found the right bull for the job

UC: Ok any age limits before we discuss my girl not trying to get caught up

MR. HOLLEY: No sir. Only a number for me

UC: Fuck yeah we are very like minded

MR. HOLLEY: Perfect. I understand wanting to be careful. Most wouldn't do this but I am a special bull.[3] 1 for families. Even when divorced. A father deserves to know how his daughter handles cock

UC: Well to be honest she plays with mine and had an old college buddy in town about six months ago and loved watching her sucking his cock

MR. HOLLEY: That's real hot. A true good daughter. Is she a virgin or has that been

---

[3] The bull is a man who is introduced to the relationship to have sex with the wife or female partner.

taken care of?

(emphasis added).

As the chat continues, the UC asked Mr. Holley, "Whats the youngest you've been with," and Mr. Holley replied, "Interesting. Wanna watch me rub mine against her puffy?[4] Maybe she can lose it to a BBC like a real good girl" and "Age 10." The UC stated to Mr. Holley, "Ok my girls 9 want to make sure you're ok with that." Mr. Holley replied "All good, *territory im familiar with*. Best part is we can make it a regular thing. And train her for life as a slut." (emphasis added). Mr. Holley also said, "It will be the hottest thing you've ever seen. If you want to film, go for it."

During the chat the UC asked Mr. Holley if all he wanted to do was rub her "puffy," referring to his purported nine-year-old daughter, and Mr. Holley responded with, "No sir. Get sucked by her, have her give me a handjob, footjob, rub her pretty lil nipples and bust nuts on her and eventually in her" and "The 1 thing i want the most: her pussy. I want her virginity." Mr. Holley also said, "ill be coming up behind her, cock on the soles of her feet. Rubbing them to entice her and alert her of my presence . . . Give her legs a rub and of course work up to her lil booty, tickling her hole but not entering it. Then to her lil tits and her sweet mouth."

Mr. Holley expressed interest in making the arrangement a repeat occurrence: "I want her to get used to me because ill be over more than just 1 time." The UC responded that it could happen, "[c]ouple times a month at least," and Mr. Holley said, "Couple times a month or even couple times a week, as much as you and her want." He went on: "Been looking for this type of arrangement for a long time."

During the chat, the UC sent an image of his purported daughter.[5] Mr. Holley responded, "Oh wow, thats perfect honestly. I am built just right for her," and sent an image of an erect penis.

---

[4] A puffy is commonly referred to as a prepubescent vagina.
[5] The image sent by the UC did not depict a real child or sexual abuse material.

The UC replied, "She's going to love it." Mr. Holley replied, "Fit for a princess like her. Best part is we have plenty of time. I want her to see it, play with it, get used to it. Compare it. BBC for her is like giving her keys to her first car." Mr. Holley referred to himself as the girl's "trainer: just like an athlete, we gotta work her body out right to prepare her for a life of being a slut for daddy."

The UC asked Mr. Holley additional questions about the ten-year-old that Mr. Holley referenced. Mr. Holley sent an image of a young girl in response. This image was not child sexual abuse material—the child was clothed with the camera focused on her feet. Mr. Holley said that he met the girl's mother on the same fetish website, and that the mother wanted Mr. Holley to "spend time" with the girl "to get back at" the girl's father. Mr. Holley said he "played" at the mother's house.

Mr. Holley said he did not have any videos of the girl, but "I wish I had the old ones." Mr. Holley went on to say, "Imagine all the hot movies we will make. Even when she's jerking me off it will be the hottest thing ever seen. Young hands working an older cock." On another occasion, Mr. Holley said, "I look forward to making some [pornography] with you and [purported daughter's name]." Mr. Holley told the UC that he had "masks of [sic] you want to film porn." The UC told Mr. Holley to bring the masks, and Mr. Holley said, "I will! She will be a hot lil slut."

While the chat continued, the UC and Mr. Holley discussed scheduling a meet for the purpose of Mr. Holley traveling to the UC's purported residence in DC to engage in vaginal intercourse and sexual activity with the UC's purported daughter. The UC and Mr. Holly had a phone conversation confirming details of their meet-up. Mr. Holley confirmed that he would be traveling to the UC's residence on September 4, 2025, at 11 AM to engage in sexual intercourse with the UC's purported daughter. However, Mr. Holley subsequently rescheduled the meeting to September 10, 2025.

Mr. Holley was identified using law enforcement databases. The phone number 443-834-XXXX was associated with Jordan Holley, born on XX/XX/1991, in numerous law enforcement

5

citations and databases.  Mr. Holley has multiple prior traffic citations from the Baltimore County (MD) Police Department. The phone number Mr. Holley provided in connection with those citations was 443-834-XXXX.  According to law enforcement databases, Holley currently resides at XXXX Hanwell Rd, Randallstown, MD 21133.  This is consistent with FeetAddict202 indicating his location was in Maryland. Owings Mill is approximately a ten-minute drive from Randallstown, Maryland.

On September 04, 2025, Mr. Holley advised that he had to cover meetings at work and that he would not be able to meet at the arranged time.  Mr. Holley and the UC discussed rescheduling, and Mr. Holley confirmed that he would be traveling to meet the UC at the prearranged location and then to the UC's residence on September 10, 2025, at 11:30 AM to engage in sexual intercourse with the UC's purported daughter.

On September 10, 2025, at approximately 12:25 PM, Mr. Holley arrived at the prearranged location and sat with the UC.  The UC asked if he was Brutus, the name that Mr. Holley advised during the conversation with the UC.  The UC then stated, "this has been a long time coming, can't wait," to which Mr. Holley stated, "yes, can't wait."  Mr. Holley was placed under arrest at that point by members of the FBI/MPD Child Exploitation Task Force members.

Holley was identified as Jordan Holley, DOB: XX/XX/1991, with an address of XXXX Hanwell Rd, Ransdallstown, MD 21133, through his Maryland driver's license which he had on his person.

Law enforcement recovered a mask, sex toys, condoms, and lubricant in a ziplock bag in Holley's vehicle.

*Figure 1:*



*Figure 2:*



Investigators conducted a custodial interview, and Mr. Holley waived his Miranda rights. During the interview, Mr. Holley advised that he travelled from Maryland to Washington, DC, to meet with the UC.  Mr. Holley admitted to arranging to travel to Washington, DC, to meet the UC and his purported nine-year-old child and have vaginal intercourse with the child.  However, Mr. Holley stated that the sexually exploitive conversation and meeting was essentially a ruse.  Mr. Holley claimed he wanted to learn more about the UC and then contact law enforcement to report the UC.

During Mr. Holley's interview, he repeatedly provided inconsistent statements and downplayed evidence.  For example:

- Mr. Holley initially told law enforcement that the scheduled meeting on September 4, 2025 did not happen because the UC rescheduled it.  When interviewers later pushed Mr. Holley and said they knew that Mr. Holley was the one to reschedule the meeting, Mr. Holley revised his statement and said it was rescheduled because of "something on his end and my end."

- When asked if there was a mask in his car, Mr. Holley initially said no.  When law enforcement later confronted Mr. Holley that there was a mask in the car, he claimed it was "for the winter time."

- When asked if there were condoms in the car, Mr. Holley said he had cologne in the car but that "it's not related."  Mr. Holley did not answer the question about condoms.  When law enforcement later confronted Mr. Holley about the sex toys and condoms found in the car, Mr. Holley said, "that's what I was saying, I had stuff in the car, but I haven't used any of it."  Mr. Holley had not previously told law enforcement that those items were in his car.

- Mr. Holley acknowledged sending an image of a minor child to the UC but said the photo was "from the internet." Mr. Holley said he sought the picture out online to "try to convince" the UC.

- Mr. Holley claimed that he reported the UC's account. However, according to law enforcement, the fetish website is very proactive about removing profiles when they are reported for child exploitation material. Based on law enforcement's experience with the website, the UC believes Mr. Holley did not actually report the profile. Moreover, there is no evidence that the defendant was working in conjunction with any law enforcement agency to report the UC's behavior. Instead, the evidence shows that he met the UC with the express purpose of engaging in sexual contact with the UC's child.

## PROCEDURAL HISTORY

The defendant made his initial appearance before this court on September 11, 2025. On the government's motion, the defendant was held pending a detention hearing, which was scheduled for September 15, 2025. At that hearing, the court released Mr. Holley to the third-party custody of his mother, Willanetta Holley.

The defense proposed Ms. Holley as the third-party custodian. Ms. Holley testified that she is retired and that she, her husband, and the defendant have lived in their home in Maryland since 2012. Ms. Holley advised that she was a "business systems analyst." Ms. Holley said there were several electronic devices in the home—a desktop computer, three laptop computers, three tablets, one phone belonging to her, two phones belonging to her husband, and internet-connected televisions.

Ms. Holley initially told the Court that her plan for the electronic devices would be that they simply wouldn't use them anymore. When asked by the government what her husband would do

with his devices, she said she "assume[d]" that he would not use them either but that they hadn't fully discussed it. When the Court directly asked her if they had a safe and could put the devices in a safe, Ms. Holley said they could do that. However, she also noted that her husband sometimes worked from home and would need to use his computer. Ms. Holley also admitted that there would be times she would need to leave the home. Ms. Holley said the home was within two miles of at least three schools. When asked if there were children in the neighborhood, she initially said there were none at all but then admitted that at least one home has children and that other neighbors may have minor relatives visit. Ms. Holley advised she had never heard of the fetish website and she had not used Telegram or Kik.

The Court agreed to release the defendant, referring to the defendant's release plan as "robust" and "strong." The Court said that the parents had "started" giving thought to how to monitor the defendant. The Court ordered the parents to get rid of their desktop computer, lock all electronic devices in their safe unless being used, and monitor the defendant's use of the internet-connected televisions. The Court also ordered home confinement and GPS monitoring.

The government now respectfully submits this Motion for Review.

## LEGAL STANDARD

Title 18, United States Code, Section 3145(a) provides:

(a) **Review of a release order** - If a person is ordered released by a magistrate, . . .

(1) the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release . . .

The motion shall be determined promptly.

On the government's motion to review a release order, this Court considers *de novo* the magistrate court's denial of pretrial detention. Although the D.C. Circuit "ha[s] not squarely decided the issue," *United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021), every other circuit to

have analyzed the issue has concluded the standard is *de novo*.  *See United States v. Blackson*, No. 23-CR-25, 2023 WL 1778194, at \*5 & n.2 (D.D.C. Feb. 6, 2023), *aff'd,* No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023) (citing decisions from the First, Second, Third, Fourth, Fifth, Eighth, Ninth, and Tenth Circuits that stand for this proposition).

In its discretion, the Court may proceed to rehear the evidence by recalling the witnesses, reviewing transcripts, or by proceeding through proffer and argument.  It may take additional evidence from new witnesses or consider arguments not raised previously.  In short, the Court may proceed as best enables it to resolve the question posed: whether any condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.

Under the Bail Reform Act, if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of [the defendant] as required and the safety of any other person and the community," the Court shall order the defendant held pending trial. 18 U.S.C. § 3142(e).  "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'"  *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019).  As a threshold matter, the government must demonstrate by a preponderance of the evidence that a defendant is a flight risk, *see United States v. Anderson*, 177 F. Supp. 3d 458, 466 (D.D.C. 2016) (citing *United States v. Xulam*, 84 F.3d 441, 443 (D.C. Cir. 1996)), and by clear and convincing evidence that he is a danger to the community, *see* 18 U.S.C. § 3142(f).

In determining whether any condition or combinations of conditions will assure the safety of the community, in light of any applicable presumptions, the Court weighs four factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g).

11

Here, Congress has specified that for an offense involving a minor victim under Section 2423, "[s]ubject to rebuttal by the [defendant], it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(E). This presumption "operate[s] at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985); *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985) (observing that the presumptions in § 3142(e) "are rebutted when the defendant meets a burden of production by coming forward with some evidence that he will not flee or endanger the community if released"). But even if the defense produces credible evidence, the presumption retains evidentiary weight and is considered by the Court among the Section 3142(g) factors. *See, e.g.*, *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010) ("Even when a defendant satisfies his burden of production, however, 'the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court.' . . . The presumption remains as a factor because it is not simply an evidentiary tool designed for the courts. Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." (quoting *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001))); *United States v. Ali*, 793 F. Supp. 2d 386, 388 n. 2 (D.D.C. 2011) ("[C]ircuits that have considered the issue require using the presumption as a factor even after the defendant has produced credible evidence.").

In making this determination, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Specifically, the presentation of hearsay evidence is permitted, and the government may proceed by proffer. *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the government is not required to "spell out in precise detail how the government will

prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986); *see also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992). A pretrial detention hearing should not be used as a discovery device. *See Smith*, 79 F.3d at 1210; *Williams*, 798 F. Supp. at 36.

## ARGUMENT

For reasons that follow, the defendant poses an unmitigable risk to community safety. Because there are no conditions of release adequate to reasonably assure community safety, this Court should reverse the magistrate court's release order and detain the defendant pending trial.

### I.    The Statutory Factors All Weigh Heavily in Favor of Detention.

#### A.    Nature and Circumstances of the Charged Offense

The nature and circumstances of the charged offense weigh heavily in favor of detention. Here, the defendant traveled from Maryland into the District with the intention of having sexual intercourse with a nine-year-old girl. This was no mere fantasy—the defendant described in clear, disturbing detail what he wanted to do to the girl. He described wanting to engage in multiple sexual acts with the child, including having vaginal intercourse with her in order to take her virginity. The defendant described previously meeting up with an adult to sexually abuse a ten-year-old girl. He discussed his eagerness to create child pornography and told the UC that he would bring materials to mask their identities. Despite having multiple opportunities to back away from the meetup with the officer, the defendant not only followed through on his attempt, but he brought sexual accessories along with him—including the mask he told the UC about that was for use in order to create child pornography.

The facts in this case are similar to those in *United States v. Breeden*, where District Court Judge Amy Berman Jackson detained the defendant noting that "this defendant did not simply express an interest in a sexual encounter with a minor, and he did not simply make arrangements for

13

a sexual encounter with a minor, but he took the affirmative, unequivocal step of driving his vehicle into the District of Columbia to arrive at the appointed time and place." *United States v. Breeden*, No. 15-MJ-0506 (AK-ABJ), 2015 WL 13310427, at *7 (D.D.C. Nov. 16, 2015). Moreover, the extreme dangerousness of this offenses is demonstrated by the fact that "but for the fact that defendant was communicating with an undercover officer, defendant could have come fact-to face with a minor and a willing parent." *Breeden*, 2015 WL 13310427, at *8.

Indeed, if the Court believes the defendant's own statements, he has previously sexually abused a child using the exact same means. This was also present in *Breeden:* "[m]oreover, the evidence in this case includes the fact that the defendant described his interest in illicit sexual contact with minors in troubling detail, and he boasted of past sexual encounters with young girls. At no point did he equivocate or hesitate or express any apprehension about the upcoming meeting." *Id*. at *7.

Indeed, the charged offense both (i) is the basis for the statutory presumption of dangerousness and (ii) involves a minor victim, which are two factors this Court is required to consider in assessing the nature and circumstances of the offense. See 18 U.S.C.§ 3142(G)(1) ("The judicial officer shall . . . take into account the available information concerning— the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a minor victim . . . ."). *See Breeden*, 2015 WL 13310427, at *7 ("Congress specifically directed courts to consider whether a defendant is charged with a 'crime of violence' when assessing the nature and circumstances of the offense factor, and it designated a violation of section 2423(b) to be a crime of violence."); *accord United States v. Johnston*, No. 17-MJ-0046 (BAH), 2017 WL 4326390, at *4 (D.D.C. Sept. 28, 2017) (noting that a violation of Section 2423(b) "is a serious crime" subject to a rebuttable presumption of detention); *United States v. Beauchamp-Perez*, 822 F. Supp. 2d 7, 10 (D.D.C. 2011) ("With respect to the nature and circumstances of the offense, the

charged offense is serious and involved traveling with intent to have sex with a twelve year-old minor victim. The Court finds that this factor supports detaining the defendant; indeed, it is the basis for the presumption in favor of detention.")  The seriousness of the offense is also reflected by Congress's judgment that those convicted of the charged offense face up to 30 years' imprisonment upon conviction. *See* 18 U.S.C. § 2423(b); *Johnston*, 2017 WL 4326390, at *4 (considering, as factors weighing in favor of detention, that a conviction "allows for imprisonment up to 30 years" and that "the defendant may face substantial prison time").

Magistrate judges in this Court have also found that detention is appropriate in other cases involving the same criminal conduct. *United States v. Brockerman*, 25-cr-133 (RDM) (granting the government's motion to detain the defendant who was charged with traveling to the District of Columbia to have sex with an undercover agent's purported child); *United States v. White*, 24-cr-340 (DLF) (granting the government's motion to detain the defendant after he traveled to the District of Columbia to sexually abuse an undercover agent's child and distributed child pornography).

Accordingly, the nature and circumstances of the charged offense weigh heavily in favor of detention.

### B. The Weight of the Evidence Against the Defendant

The weight of the evidence against the defendant is very strong and weighs in favor of detention.  The government is in possession of the chats between the UC and the defendant, which are the evidence of the defendant's criminal conduct.  As detailed above, the defendant engaged in extensive, detailed conversations with an undercover officer about his sexual interest in children and, made specific plans to sexually abuse the agent's purported nine-year-old daughter. The defendant made his intent toward the purported child perfectly clear: "get sucked by her, have her give me a handjob, footjob, rub her pretty lil nipples and bust nuts on her and eventually in her . . .The 1 thing i want the most: her pussy. I want her virginity."  After describing his plan in disturbing detail, the

defendant then acted to carry out his plan by driving in to the District and meeting the undercover officer at a pre-determined location.

The defendant told law enforcement in his post-arrest interview that his intention was not in fact to have sexual intercourse with the child but to learn more information about the UC and then turn him into police. This claim is not supported by the defendant's own actions in preparing for the meeting. There is no evidence that he contacted law enforcement prior to the meetup or reported the UC's profile on the fetish life website.[6] But most critically, the defendant brought items to assist in his sexual abuse—sex toys, lubricant, condoms, and a mask to allow him to produce child pornography without being identified.

A district court must consider the weight of the evidence when assessing whether the defendant is a danger or poses a risk of flight and has broad discretion to determine the relative weight of each of the four Bail Reform Act factors. *See United States v. Blackson*, No. 23-CR-25 (BAH), 2023 WL 1778194, at *9 (D.D.C. Feb. 6, 2023), *aff'd*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023) ("First, nothing in the BRA's text requires or alludes to a differing weighing of the factors nor any hierarchy among the factors."). No factor is categorically of greater or lesser weight than the others. As the Second Circuit Court of Appeals observed:

> Although § 3142(g) of the Bail Reform Act lists various factors to consider, it says nothing about the relative weight a court should give them when deciding whether to release or detain a defendant. *See generally* 18 U.S.C. § 3142(g). That silence is unsurprising, because the weight given to each factor will inevitably vary from case to case, and might even vary depending on whether the inquiry relates to a defendant's danger or to his risk of flight. What is more, certain factors might interact with one another in a particular case in a way that alters a court's analysis of a defendant's danger to the community or flight risk.

---

[6] Mr. Holley claimed in his interview that he reported the UC's profile on the fetish website but the UC's profile was not removed. However, according to law enforcement, the fetish website is very proactive about removing profiles when they are reported for child exploitation material. Based on law enforcement's experience with the website, the UC believes Mr. Holley did not actually report the profile.

16

*United States v. Zhang*, 55 F.4ᵗʰ 141, 149-50 (2ᵈ Cir. 2022). In *Zhang*, the Second Circuit found that the district court gave appropriate weight to the second factor – the weight of the evidence – in determining that there was "significant evidence" that Zhang had in fact committed the charged murder. *Id.* at 150-51. Affirming the district court's relative reliance on the weight of the evidence in determining dangerousness, the court explained:

> In making a predictive assessment of the defendant's future dangerousness if released into the community, common sense and § 3142(g)(2) aligned with the district court's consideration of the strength of this evidence, especially coupled with the nature of the charged offense. It stands to reason that the more strongly the evidence indicated that the defendant committed the murder, the more likely he poses a danger to the community if released on bail.

*Id.* Similarly, in considering whether the defendant poses a risk of flight, the court explained that where "the evidence against a defendant is strong, it follows that the defendant faces an elevated risk of conviction (and of the attendant punishment), and therefore may present an elevated risk of flight. *Id.* at 151-52.

The *Zhang* court's analysis has been cited approvingly in the District Court of the District of Columbia in *Blackson*, and its analysis holds true here as well. *Blackson,* 2023 WL 1778194, at *9-10. The evidence against Mr. Holley is strong, suggesting a heightened danger to the community. The strength of the evidence strongly supports detention, as it indicates the significant risk of danger posed by the defendant.

### C. <u>The History and Characteristics of the Defendant</u>

While the defendant does not have any criminal history, there is reason to believe that he has engaged in criminal activity prior to his conduct in this case. The defendant told the UC that he previously sexually abused a ten-year-old girl. He also said he had "experience" with fathers and daughters. There is no reason to believe that these were not truthful statements. In fact, the defendant sent a clothed photograph of a prepubescent child and said this was his prior victim.

17

Further, the defendant's use of common language and knowledge of information associated with individuals who sexually abuse children support that this was not merely fantasy or conjecture. Finally, the defendant showed up to his meeting with the UC prepared for extensive sexual activity, bringing condoms, lubricant, and multiple sex toys. These are not the actions of someone who has never abused a child before. This evidence shows that the defendant's lack of criminal history does not accurately portray his history of criminal conduct.

Additionally, the absence of prior criminal convictions is not sufficient to rebut the statutory presumption of dangerousness on the facts of this case. *See, e.g. Breeden*, 2015 WL 13310427, at *7 ("But the inferences the defendant is asking the Court to draw do not go far enough. The Court is not certain that a lack of more incriminating evidence constitutes 'evidence' that rebuts the presumption arising from the undisputed facts of the case." (emphasis in original)); *Pope v. United States*, 739 A.2d 819, 826 (D.C. 1999) (explaining that, under the D.C. Code's rebuttable presumption, if a court makes the requisite finding that a defendant committed certain crimes, then the "defendant is presumed to be dangerous (and subject to preventive detention) even if his prior record is clean and if no other showing of dangerousness is made"). In fact, the absence of a prior criminal history is evidence of the defendant's ability to engage in a pattern of deceit and conceal his criminal conduct from law enforcement and from those closest to him. This makes the defendant particularly dangerous to the community if he is released because of his ability to hide his criminal conduct.

The other troubling aspect of the defendant's conduct is the pattern of deceit he engaged in both during the commission of the offense and after his apprehension. The defendant engaged in a lengthy discussion with the undercover agent regarding his desire to sexually abuse a child, a discussion which needed to remain secret due to its criminal nature. Following his apprehension, the defendant concocted a story that he met with the UC in order to report them to law enforcement.

This story was entirely undercut by the items he brought with him to the meeting: condoms, sex toys, and lubricant. These items were meant to be his tool kit to commit the acts of sexual abuse he described in the chats with the UC. In spite of law enforcement agents asking the defendant if he had condoms in the car, he only stated he had cologne in the car. It was only after he was further confronted by agents that he admitted to the presence of condoms and sex toys in his vehicle. Despite being in law enforcement custody, the defendant persisted in lying about his reason for meeting the undercover agent. The defendant's lies are troubling when considering release into the community. An individual who is capable of engaging in this level of deceit while facing questioning from law enforcement is not an individual who can be trusted to abide by the law on release.

Thus, the defendant's history and characteristics weigh in favor of detention.

### D. <u>The Nature and Seriousness of the Danger to any Person or the Community</u>

Finally, the sexual exploitation of children presents a serious danger to the community, which results in severe mental, emotional, and physical trauma to the countless children who are victimized by offenders like the defendant and others with a demonstrated sexual interest in children. It is this type of harm that led Congress to create the statutory presumption of detention in these cases.

The evidence in this case establishes that the defendant poses a grave danger to the community. As discussed above, the defendant admits to sexually abusing children in the past and is charged with traveling across state lines into the District of Columbia to sexually abuse a purported nine-year-old girl. The defendant also expressed an interest in child pornography, lamenting the fact that he did not have any child pornography from his prior abuse and expressing interest in creating child pornography with the purported nine-year-old girl. The defendant took a substantial step toward this goal by bringing a mask, contained in the same bag as his condoms, sex toys, and lubricant, in order to mask his identity in any videos or photos he intended to produce while he

19

sexually abused the UC's child.  In addition, "the fact that the defendant poses a danger is presumed and is to be factored into the statutory analysis, even if some contrary evidence has been adduced." *Breeden*, 2015 WL 13310427, at *9 (citing *Stone*, 608 F.3d at 945–46).

## II.     The Magistrate Court's Release Order Should be Reversed.

The magistrate court's release order should be reversed.  In this jurisdiction, magistrate judges generally detain defendants charged with child pornography or child exploitation offenses due to the difficulty in adequately monitoring their conduct while on release.  These are offenses that occur online and are easy to conceal from the people closest to the defendant.  In this case, the proposed third-party custodian, the defendant's mother, resided with the defendant at the time he committed the instant offense—however, they did not detect his criminal conduct.  This demonstrates that the defendant was able to able to conceal his criminal conduct from the very same people who are supposed to monitor his compliance with pretrial release conditions and detect if he is engaging in further criminal conduct.  The defendant's commission of the instant offense while he resided with his parents significantly undercuts any claim that they can serve as appropriate third-party custodians.

These are the same types of issues that judges across the courthouse have raised in deciding to detain defendants in these cases:

- *United States v. Jose Martinez,* 22-cr-78 (ABJ) – Judge Howell affirmed the magistrate judge's decision to detain a defendant charged with possession of child pornography where his mother and sister were considered inadequate third-party custodians due to their presence in the home when the defendant committed his offense.

- *United States v. James Carroll*, 24-cr-544 (APM) – Judge Mehta denied defendant's motion to review the magistrate judge's detention order for defendant charged in connection with chatting with an undercover agent, where his wife, who resided with

him at the time of the offenses, was his proposed third-party custodian. Judge Mehta went on to say that even if no access to devices was a condition of his release, "I simply just don't trust, given his compulsiveness and his demonstration of a high degree of sophistication, that he won't be motivated to somehow gain access to devices."

- *United States v. Eduardo Vides*, 24-cr-216 (BAH) – Judge Howell granted the government's motion to detain the defendant who was charged with distribution of child pornography and holding that the defendant's family members were inadequate third party custodians because his "family was unaware of his alleged criminal conduct, and due to the private nature and use of electronic devices in his purported offenses, it would be difficult for defendant's family to monitor him to the extent necessary to ensure his compliance with his conditions."

- *United States v. Timothy Brockerman*, 25-cr-133 (RDM) – Magistrate Judge Harvey granted government's motion to detain defendant charged with 18 U.S.C. 2422(b) where his romantic partner was an inadequate third-party custodian.

- *United States v. Victor Blythe*, 25-cr-253 (DLF) – Magistrate Judge Harvey granted government's motion to detain defendant charged with distribution and possession of child pornography where defendant's brother was proposed third-party custodian, noting "the alleged criminal conduct with which Defendant is charged occurred over the span of many years without detection by his family or community members." ECF 19-1 at 7. Judge Friedrich upheld this decision on the defendant's appeal.

While 18 U.S.C. 3142 allows for release if a combination of conditions can "reasonably assure" the safety of the community, providing the same third-party custodian who failed to detect the defendant's prior criminal conduct with the responsibility of reporting future conduct does not

meet the standard. Moreover, this defendant did more than speak to an undercover online. He took the further step of trying to sexually abuse a child. This highlights that the defendant is willing to commit acts of sexual abuse against children who are strangers to him. Releasing the defendant into the community places children in the community in danger.

A third-party custodian is not appropriate in this case. In *United States v. Hoppe*, No. 23-CR-102, the defendant traveled to a hotel in Virginia intending to rape an eight-year-old girl. The defendant sought to be released to home incarceration under the custodianship of her aunt. Judge Contreras rejected that proposal as wholly inadequate to assure community safety given the nature of the allegations:

> The Court is not convinced that these proposed conditions would reasonably mitigate the risk Defendant's release would pose to the community. First, it is generally true that, in cases "involving illicit online conduct involving a minor, a defendant cannot establish that an appropriate third-party custodian exists, since, given the ubiquity of internet-capable devices, ensuring against continuing illegal conduct on release often presents insurmountable challenges." *United States v. Dhavale*, No. 19-mj-92, 2020 WL 1935544, at *5 (D.D.C. Apr. 21, 2020). That principle applies foursquare here. Defendant's papers make clear that her proposed third-party custodian has multiple internet-capable devices in her home, including a computer, an iPad, and a cellphone. *See* Def.'s Suppl. Mot. at 3. Defendant asserts that these devices would be difficult to access for multiple reasons. *See id.* But Defendant does not assert that her aunt would be able to monitor her at all hours of the day. Nor is the Court persuaded that Defendant would be unable to access any other internet-capable devices. Defendant "needs only a hand-held device to access and/or distribute child pornography." *See Galarza*, 2019 WL 2028710, at *6. And because Defendant's aunt cannot provide round-the-clock monitoring, "the absence of such small devices in [Defendant's aunt's] residence cannot be meaningfully verified on a continuous basis." *See id.*

*United States v. Hoppe*, No. 23-CR-102, 2024 WL 1990452, at *6 (D.D.C. May 6, 2024) (Contreras, J.). The same concerns apply here. Even if a magistrate court ordered that the defendant could not have any internet-capable devices, there is no plan in place for ensuring that he would follow this but for *his mother*'s monitoring—not Pretrial Services. A third-party custodian could not "provide round-the-clock monitoring," and "the absence of such small devices in [the] residence cannot be meaningfully verified on a continuous basis."

Indeed, district courts in this jurisdiction have recognized the challenge faced by third-party custodians—who are essentially being asked to act as correctional officers 24 hours a day for someone about whom they care deeply—and have repeatedly rejected such arrangements as inadequate to reasonably assure community safety. *See, e.g.*, July 24, 2023, Hr'g Tr. 24:14–25, ECF No. 20, *United States v. Gorham*, 23-CR-206 (D.D.C. Aug. 17, 2023) (Berman Jackson, J.) ("I'm concerned that she doesn't have the distance or independence to be his supervisor, and essentially his jailer, after being under U.S. Probation Office supervision while married to her wasn't enough to do the trick. And I'm not sure it's appropriate to put her in the position of searching his car every day."); Order at 9, ECF No. 54, *United States v. Cunningham*, 23-CR-7 (D.D.C. Mar. 13, 2023) (Cobb, J.) (same) ("[A] third-party custodian, no matter how competent or dedicated, cannot stand in the shoes of the defendant. Nor should a third-party custodian be cast in the role of jailer. To do so is neither realistic nor fair to the custodian. . . . [The defendant's] custodians cannot supervise his behavior on a 24/7 basis."); Order at 14, ECF No. 18, *United States v. Wright*, 22-CR-410 (D.D.C. Dec. 23, 2022) (Cooper, J.) (same) ("But family members are not correctional officers. Nor should they be expected to play that role"); Order, ECF No. 14, *United States v. Joyner*, 22-CR-252 (D.D.C. Aug. 3, 2022) (McFadden, J.) (same); Order, ECF No. 55, *United States v. Handy*, 22-CR-164 (D.D.C. June 21, 2022) (Walton, J). (same), *aff'd*, Case No. 22-3045 (D.C. Cir.).

And in *Blackson*, then–Chief Judge Howell reversed the magistrate court's release order and discussed the inadequacy of a similar third-party custodian arrangement:

> The proposed conditions impose responsibilities similar to those of full-time and professional employees at detention facilities, but without the benefit of shifts or breaks in service as custodian. Defendant's mother's capability to uphold those conditions long-term is questionable. Certainly, the Magistrate Judge attempted to assuage skepticism about the long-term ability of defendant's mother to fulfill all the proposed conditions, and defendant's mother obliged by affirming her willingness and ability to do so. Regardless of whether defendant's mother is a pillar of the community with ties to local government and law enforcement, she was and has been part of defendant's support community that unsuccessfully kept him out of the court

system following his release only last May.  She is currently permitted to work from home for "maybe two or three months for now" and after that, she will have to "see" about her ability to work remotely every day.  Defendant argued that other individuals were approved as third-party custodians to cover gaps in his mother's availability, but that risks inconsistency in the conditions of home incarceration that, as of now, are completely placed on his mother.  To be clear, a benefit of professional detention facilities is the consistency in insuring detention conditions.  Defendant's ability to obtain a fully loaded and unregistered gun while on probation, despite the family support he enjoys, underscores that the best intentions and most valiant efforts of defendant's mother to fulfill all the proposed conditions provide no guarantee these conditions will be maintained to the letter for the duration, possibly many months, of defendant's pretrial proceedings.

*Blackson*, 2023 WL 1778194, at *12 (record citations omitted).

*United States v. Nathaniel Lamar Scott*, 24-cr-287 (DLF) is especially relevant here, as the facts as nearly identical.  The defendant met an undercover officer (UC) on a fetish website and made plans to meet up in order to abuse a purported six-year-old girl.  The defendant bragged to the UC about previously proposing an eight-year-old girl.  The defense proposed that the defendant be released to his parents' custody in a single-family rental property in an isolated part of Virgina, Maryland, or Pennsylvania.  The magistrate judge released the defendant, but this decision was reversed by Judge Freidrich.

Judge Freidrich noted that "the digital nature of Scott's crime poses heighted risks to community safety." ECF 16 at 12.  Although the court did not question the "veracity and sincerity" of the defendant's mother in her representation that she would supervise Scott, "the Court questions the ability of *any* third-party custodian to provide round-the-clock monitoring necessary to ensure absence of "small [internet-accessible] devices in [the] residence." *Id.* (emphasis in original) (citing *Hoppe*, 2024 WL 1990452, at *6).  The Court also noted that "Scott was residing in his mother's home at the time he took steps to commit the charged offense."  *Id.* at 13.  Finally, the Court distinguished this case from *United States v. Willis*, 22-mj-122, and noted it was "not convinced that *any* proposed release conditions could feasibly and effectively mitigate Scott's dangerousness to the

24

community." (emphasis in original)

The similarities between the *Scott* and this case are overwhelming: both men were charged with travel with intent to engage in illicit conduct; both described in graphic detail how they wanted to sexually abuse a prepubescent girl; both told the UC that they had previously sexually abused children; both had no criminal history and strong ties to the community; both had mothers who were willing to serve as third-party custodians. However, unlike in *Scott*, Mr. Holley discussed filming the sexual abuse of the child, and he showed up to his meeting with the UC prepared to sexually abuse a child and record it. Further, in *Scott*, the defendant's mother was even willing to relocate to an isolated area in another state. This still did not resolve the Court's concerns, given the extreme danger to the community that the defendant faced. Likewise, here, Mr. Holley's mother's assurances that she will monitor his activity cannot assure the Court that the community will be secure if Mr. Holley is released.

As noted by the Court in *Breeden*, "[w]hile [Pretrial Services] would be in a position to provide GPS monitoring if defendant is equipped with an ankle bracelet, and it would be alerted if he left the house, it does not have the capacity to monitor compliance any of the other conditions, including whether defendant was ever left unsupervised in the home, whether he used a computer, whether he accessed sexually-explicit or dating websites or engaged in troubling chats or communications, and whether he had contact with any minors. In other words, it would be the defendant's parents, and the defendant's parents only, who would be charged with monitoring and enforcing the conditions of release." 2015 WL 13310427 at *6. This highlights the concern with third-party custodians in cases involving online crimes, as discussed *supra*.

At the detention hearing, the defendant cited to *United States v. George Oglesbee*, 22-cr-177 (RBW). In that case, the defendant, a 62-year-old man, was also charged with Travel with Intent to Engage in Illicit Sexual Activity for traveling from Virginia to Washington, DC to have sex with a

fourteen-year-old girl. The defendant's initial appearance was on July 29, 2020, and a detention hearing was held on the same day "[i]n consideration of the COVID-19 Pandemic." Motion for Emergency Stay and for Review of Release Order, ECF 3 at 2. Notably, the defendant suffered from a medical condition that placed him at increased risk for complications from COVID-19. Defendant's Opposition to the Government's Motion for Emergency Stay and Response to Government's Motion for Review of Release Order, ECF 5 at 5. The Court ultimately affirmed the magistrate court's decision to release the defendant.

This case is quite different that the one before this Court. Respectfully, this Court and its defendants are not similarly situated to cases that were initiated during the height of the pandemic. The risk of serious disease provided an extra factor that judges took into consideration when determining whether a defendant should be detained during this time period. Although Judge Howell did not issue a written order in this case, it is quite likely that the defendant's age and medical condition were factors that played into her decision to release him during the height of COVID-19.

Here, although the government, like the Court in *Scott*, does not doubt Ms. Holley's sincerity in her representations that she will monitor the defendant, such representations are not adequate to protect the community. Notably, this offense was done surreptitiously, without Ms. Holley's knowledge. The defendant has also already demonstrated deceitful behavior: he repeatedly made false or inconsistent statements to law enforcement in his interview. Even with Ms. Holley's best intentions, she is not well-suited to monitor the defendant's actions, given both the clandestine nature of child exploitation offenses and the defendant's penchant for deception. This Court cannot be assured that the defendant will follow the conditions of release and cannot ensure community safety if he remains released.

## **CONCLUSION**

For the foregoing reasons, the magistrate court erred in setting conditions of release.  Nothing short of detention is adequate to protect the community in this case.  The government respectfully requests that this Court reverse the magistrate court's release order and detain the defendant pending trial.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

Dated: September 16, 2025          By:     */s/ Rachel Bohlen*
                                   Rachel Bohlen
                                   D.C. Bar No. 1010981
                                   Assistant United States Attorney
                                   United States Attorney's Office
                                   for the District of Columbia
                                   601 D Street NW
                                   Washington, DC 20530
                                   (202) 809-3575
                                   rachel.bohlen@usdoj.gov